610                                SUPREME COURT,

Cotton et al. vs. The Co. Commissioners of Leon Co. et al.—Statement of Case.

FREDERICK R. COTTEN AND WILLIAM G. PONDER, APPEL-
LANTS, VS. THE COUNTY COMMISSIONERS OF LEON COUNTY,
ET AL. APPELLEES.

1. Under our State Constitution it is the appropriate function of the judicial
department to decide whether a statute of the Legislature, be or be not consti-
tutional; but in deference to a co-ordinate branch of the Government, it ought
never to nullify a statute, except in a case free from doubt.

2. In proceeding to define and determine the constitutional power of the Legis-
lative department, it is proper to note the characteristic difference which marks
our Federal and State Constitutions. Whilst the former contains only specific
grants of powers, the latter makes a general grant of all the political power
of the people, restrained only by specific reservations. Hence in determining
upon the validity of statutes the acts of Congress are to be construed with
greater stringency, than the acts passed by our General Assembly.

3. No certain rule can be prescribed by which to determine when a work of in-
ternal improvement shall be deemed to be embraced within the meaning of the
phrase, "County purpose" as the same is used in the 4th clause of the 8th ar-
ticle of the State Constitution. Neither the *locality* of the work, nor the anti-
cipated *benefit* to be derived from it, is of itself a certain test; but as furnishing
a general rule, the concurrence of the two would seem to be required.

4. Whether the 2d section of 8th article of the State Constitution imposes an im-
perative *restriction* upon the taxing power of the General Assembly, and such
an one as can be enforced by the judicial department, or whether it is only dis-
cretionary. *Quere !*

5. That the Pensacola and Georgia Railroad Company, is a private corporation,
affords no valid reason why the shares of its capital stock, purchased by and
on behalf of the County of Leon, should not be deemed to be the public prop-
erty of the citizens of the County.

6. The act of subscription to the capital stock of the Pensacola and Georgia Rail-
road Company, by the Board of County Commissioners of Leon County, is
within the meaning of the phrase " County purposes" as used in the Constitu-
tion of the State.

7. The word " necessary" occurring in the 2d clause of the 8th article of the Con-
stitution and by implication transferred to the 4th clause of the same article,
when applied to the taxing power of the County authorities is to be taken

Cotton et al. vs. The Co. Commissioners of Leon Co. et al.—Statement of Case

rather as an indication of a grant of *discretion*, to be exercised within the appropriate limits of their general power, than as a restraint upon that power.

8. The provision of the act. which required that a subscription to the Stock of the Railroad Company, by the County Commissioners, should depend upon a vote of the qualified voters of the county, was not a delegation to the people of legislative powers, but only a legitimate mode of obtaining an expression of the will of the constituent, as a guide for the action of the representative.

9. The provision contained in the act, that each tax-payer should receive a remuneration in the shape of Stock in the Railroad Company, equivalent to the amount of his tax assessment, is not in conflict with either the 1st or 24th clauses of our "Declaration of Rights."

10. The provision of the act which authorizes the counties to issue Bonds for the purpose of raising money to pay for the stock to be purchased, does not contravene the letter or spirit of the 13th clause of the 13th article of the Constitution, which prohibits the General Assembly from pledging the faith and credit of the State to raise funds in aid of Corporations.

11. The 22d section of the act of the General Assembly of 1855, entitled "An act to provide for and encourage a liberal system of Internal Improvements in this Stats," declared to be constitutional.

Appeal from Leon Circuit Court sitting in Chancery.

Appellants filed their bill for an injunction to restrain the County Commissioners of Leon County from levying and collecting a tax imposed by them to meet an instalment of stock subscribed by the County in the Pensacola and Georgia Railroad Company.

On presenting the bill, an injunction was granted, which however, was dissolved on the coming in of the answer, and the bill was dismised.

The question presented by the pleadings for the decision of the Court, is, whether the General Assembly has the constitutional power to confer upon counties as attempted by the "act to provide for and encourage a liberal system of Internal Improvements in this State," passed in January, 1855, the authority to subscribe for shares in the capital stock of certain Railroad Companies, and impose and collect taxes for the payment thereof.

*M. D. Papy*, and *D. P. Hogue*, for Appellants.

*Jas. T. Archer* and *A. L. Woodward*, for Appellees.

DUPONT J., delivered the opinion of the Court.

It would prove but a useless waste of words—an unprofitable expenditure of time—to engage in any labored effort to impress the importance of the question presented by this case for the adjudication of the court.

The bare announcement that it involves the construction and interpretation to be given to certain clauses of the Constitution of the State—the fundamental law of the land—the embodiment of the delegated sovereignty of the people—is a sufficient guarantee that it has received at the hands of the court that calm, thorough and anxious consideration which befitted the occasion. Without, therefore, indulging in the encomiums upon our republican institutions which usually constitute the exordium to efforts of this character, we the rather address ourselves at once to the particular point involved in the case, and, aided as we have been by the arguments and investigations of the able counsel engaged on either side, we shall endeavor, plainly and briefly as we may, to assign the reasons which have operated to conduct our minds to the conclusion at which we have arrived.

Before, however, entering upon the discussion of this point, it may not be inappropriate or unprofitable to consider and endeavor to define the legitimate power of the judicial department, when called upon to arrest the action of a co-ordinate branch of the government. Indeed, we deem a clear apprehension of the limits of this power not only essential to the harmony of the three great departments which have been established by the fundamental law as contained in their State Constitution, but absolutely

necessary for the very conservation of that instrument itself; for it has happened, and may again happen, that the arm which is invoked for the protection of that sacred palladium of our political rights may, from a misapprehension of its legitimate functions, give it its most deadly wound. Instances are not lacking to show that the judiciary, in essaying to shield the Constitution against the presumed aggressions of the Legislature, has itself become the greater aggressor. Every enlightened court will be admonished by these instances, of how delicate a character is the duty imposed upon it, when called to decide upon the constitutionality of an act of the Legislature. While it is an essential element in the character of an independent judiciary firmly to maintain and resolutely to exercise its appropriate powers when properly invoked, it is equally its duty to be careful not rashly and inconsiderately to trench upon or invade the precincts of the other departments of the government.

That the judicial department is the proper power in the government to determine whether a statute be or be not constitutional will not, at this day, be questioned. That matter, though once mooted by no less a man than Thomas Jefferson, was put finally to rest by the decision in the case of Marbury vs. Madison, wherein C. J. Marshall gave it the sanction of his great name. But it is a most grave and important power, not to be exercised lightly or rashly, nor in any case where it cannot be made to appear plainly that the Legislature has exceeded its powers. If there exist upon the mind of the court a reasonable doubt, that doubt must be given in favor of the law. In support of this position is the case of Hylton vs. the United States, 3 Dallas R., 171, in which Mr. Justice Chase declares, "if the court have such power, I am free to declare that I will never exercise it but in a very clear case." And in Cooper

vs. Telfair, 4 Dall., 14, Mr. Justice Washington says, "the presumption must always be in favor of the validity of the laws, if the contrary is not clearly demonstrated." In Fletcher vs. Peek, 8 Cranch R., 87, C. J. Marshall, who in the previous case of Marbury vs. Madison, had dwelt so strenuously upon not only the power but the *duty* of the judiciary to restrain the other departments within their appropriate boundaries, declared, "it is not on slight implication and vague conjecture that the Legislature is to be pronounced to have transcended its powers and its acts to be considered void. The opposition between the Constitution and the laws should be such that the Judge feels a clear and strong conviction of their incompatibility with each other."

In further support of this position may be cited any number of decisions by the State courts. We shall refer to only a few of them, remarking, however, that if there be one to be found which constitutes an exception to the general doctrine, it has escaped our search. In Adams vs. Howe, 14 Mass. R., 345, the doctrine is thus stated: "The Legislature is, in the first instance, to be the judge of its own constitutional powers, and it is only when manifest assumption of authority or misapprehension of it shall clearly appear that the judicial power will refuse to execute the law." In Wellington vs. Petitioners, &c., 16 Pick. R., 95, the same court announce their determination "never to declare a statute void unless the nullity and invalidity of the act are placed, in their judgment, beyond reasonable doubt. In the case of City of Louisville vs. Hiatt, 2 Mon. 170, the Court of Appeals of Kentucky, say: "If it be *doubtful* or *questionable* whether the legislative power has exceeded its limits, the judiciary cannot interfere, though it may not be satisfied that the act is constitutional." The same doctrine is again announced by that

court in the case of Lexington vs. McQuillan's heirs—9 Dan., 514—they declare : " We should be justly chargeable with wandering from the appropriate sphere of the judicial department were we, by subtle elaboration of abstract principles and metaphysical doubts and difficulties, to endeavor to show that such a power may be questionable, and on such unstable and injudicious ground to defy and overrule the public will, as clearly announced by the legislative organ."

In the case of Police Jury vs. Succession of McDonough, decided in the Supreme Court of Louisiana and reported in 8th Lous. An. Reports, 341, Slidell, C. J., says : " It is true, that if a statute passed by the Legislature is not warranted by the powers vested in that body, such act cannot have the force of law, and it is the solemn duty of the judiciary so to declare it when an attempt is made through the judiciary to enforce it. But this is a most grave judicial power, not to be exercised lightly nor in any case where it cannot be made to appear plainly that the Legislature has exceeded its powers. In just deference to a coordinate department of the government, it is always to be presumed that a statute is conformable to the Constitution and has the form of law until the contrary is clearly shown."

Ranny, J., in delivering the opinion in the case of the Cincinnati, Wilmington and Zanesville Railroad Company vs. the Commissioners of Clinton county, reported in 1st Ohio State Reports, 77, has placed this matter in such strong light that we cannot resist a further citation, even at the hazard of being considered unnecessarily prolix. He says : " But while the right and duty of interference in a proper case are thus undeniably clear, the principles by which a court should be guided in such an enquiry are equally clear, both upon principle and authority. It is

never to be forgotten that the presumption is always in favor of the validity of the law, and it is only when manifest assumption of authority and clear incompatibility between the Constitution and the law appear that the judicial power can refuse to execute it, which interference can never be permitted in a doubtful case; and this results from the very nature of the question involved in the enquiry. The Legislature is of necessity, in the first instance, to be the judge of its own constitutional powers. Its members act under an oath to support the Constitution, and in every way under responsibilities as great as judicial officers. Their manifest duty is never to exercise a power of doubtful constitutionality. Doubt in their case, as in that of the courts, should be conclusive against all affirmative action. This being their duty, we are bound in all cases to presume they have regarded it, and that they are clearly convinced of their power to pass a law before they put it in the statute book."

But why multiply authority to sustain a proposition so plain—so reasonable and perfectly conclusive to the mind of any one, who has the slightest apprehension of the principles underlying the great fabric of a Republican Government? Upon the rigid observance of the principles embraced in this proposition, depends the harmony of the great departments of the government. Violate it, and soon they will be seen like errant spheres madly shooting from their appropriate orbits, and engendering passion, strife, embarrassment, confusion, uncertainty, where there should alone exist love, peace, union, concord and co-operation.

The Constitutional power of the General Assembly to confer upon the several counties of this State as they have attempted to do by the enactment of the 22d section of the act of 1855, entitled " an act to provide for and encourage a liberal system of Internal Improvements in this State,"

the authority to subscribe for shares in the capital stock of certain Railroad Companies therein referred to, and to provide by taxation through their respective Boards of County Commissioners, for the liquidation of the debt so to be incurred, is the particular question submitted for our decision.

In order to a better understanding of the argument, and as in its progress we shall have occasion to refer specially to its provisions, it may be proper to set forth the section in full. It is as follows:

" SEC. 22. *Be it further enacted*, That it shall be lawful for the Board of County Commissioners of any County, or the Mayor and Council of any City, or the Trustees of any Town, through or near which such Railroad or their extensions may pass or in which they may terminate, and they are hereby authorized to subscribe and hold stock in said Company, upon the same terms and conditions, and subject to the same restrictions as other stockholders: *Provided*, it shall be first submitted to the vote of the legal voters of said County, City, or Town, to be held and taken at such times and places, and in such a manner, as said authorities respectively may appoint, whether or not stock shall be taken ; and if when the vote be thus taken it shall appear that a majority of the votes shall be in favor of such subscription, it shall thereupon be lawful for the board of county commissioners, city or town authorities, by agents by them appointed, to subscribe and take in such company such an amount of stock as they shall determine : *Provided*, That in no case of county subscription the amount shall exceed fifty per cent of the cost of construction through said county ; and to issue the bonds of said county, city or town, payable with interest at such times and places as they may deem proper, and dispose of the same for the payment of such subscription, pledging the faith and resour-

ces of said county, city or town, for the payment of such Bonds and interest, and they shall from time to time, levy and collect such a tax as shall be necessary to pay the instalments of interest on the bonds, as the same become due, or to create a sinking fund for the gradual reduction of the same : *Provided*, That the rate of interest shall not exceed ten per centum per annum ; or funds may be raised by such Board of County Commissioners, or city or town authorities, by tax, in such sums or instalments as will meet such subscriptions and the receipt for the payment of such tax, shall entitle the payers thereof for every one hundred dollars so paid, to have one share or more, as the case may be, of the stock so subscribed by said county commissioners, city or town, in said company. and which receipts shall be assignable. No stock held by any county, city or town, shall be asssignable by said county, city or town until the bonds issued for the purpose of procuring funds for the payment of said county, city or town subscription, shall be paid, except in exchange for such bonds."

The counsel for the appellants, contesting the exercise of this power by the General Assembly, have cited us to several general principles of government which, even if they were not expressly enunciated in our "Declaration of Rights," are of too universal acceptation in this country to admit of any question as to their correctness. Among the propositions thus cited is the one "that all political power is inherent in the people." While we readily admit the truth of this proposition, we by no means concur in the application which has been made of it, or in the argument attempted to be deduced therefrom. If we correctly apprehend the use intended to be made of this political axiom, it was to assimilate the Federal and State Constitutions and to invoke the same stringency of construction when applied to the one as to the other. But

Cotton et al. vs. The Co. Commissioners of Leon Co. et al.—Opinion of Court

there exists a manifest difference in the very elements of the two instruments, and this elemental difference induces also a difference in the rules of construction to be applied to either instrument. Whilst the Federal Constitution contains only specific grants of powers, coupled with a general reservation, the State Constitution makes a general grant of all the political power of the people, restricted only by specific reservations. This characteristic difference will be readily perceived by a bare reference to the two instruments. In the 8th section of the first article of the Federal Constitution is enumerated specially the several powers delegated to the legislative department of the General Government. But, so jealous were the people of the respective States, that, not content with this special enumeration of the powers intended to be granted, they afterwards fortified their reserved rights by an affirmative declaration, in the nature of an amendment to that instrument, "that the powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." Here, as before remarked, is a specific grant, with a general reservation. In section 1st of article 2nd, in our State Constitution, may be found the grant of power which the people have delegated to the State government. It is couched in these terms:

"The powers of the government of the State of Florida shall be divided into three distinct departments, and each of them confined to a separate body of magistracy, to wit: those which are legislative to one; those which are executive to another, and those which are judicial to another."

This is certainly a full, entire and express grant of *all* political power, and may be correctly denominated a general grant; but, in the 27th clause of the first article constituting the "Declaration of Rights," is contained the re-

striction upon that grant, and that clause is in the following words, viz:

"That to guard against transgressions upon the rights of the people, we declare that everything in this article is excepted out of the general powers of government, and shall forever remain inviolate; and that all laws contrary thereto, or to the following provisions, shall be void."

Here, then, is a general grant of powers, coupled with specific restrictions, and this comparison serves to verify the characteristic difference existing between the two instruments, as before announced. Indeed, all writers who have commented upon the subject, readily admit the elemental difference and freely recognize the difference to be observed in applying the rules of construction.

Without further elaboration of the general propositions assumed by the counsel for the appellants, we now address ourselves to the specific objections alleged in argument against the power of the General Assembly to pass the section of the act of 1855 complained of. The main argument of the appellants is based upon the assumption that the first and second clauses of the 8th article of the State Constitution contain restrictions upon the taxing power of the General Assembly, and that by implication, if not expressly, all these restrictions are applicable to and control the taxing power of the county authorities. The sections referred to are in these words:

"1st. The General Assembly shall devise and adopt a system of revenue, having regard to an equal and uniform mode of taxation, to be general throughout the State."

"2nd. No other or greater amount of tax or revenue shall at any time be levied than may be required for the necessary expense of government."

The fourth section of the same article, which contains

the only special delegation of power to the counties to tax, is in these words:

"The General Assembly shall have power to authorize the several counties and incorporated towns to impose taxes for county and corporation purposes, respectively, and all property shall be taxed upon the principles established in regard to State taxation."

Now, without undertaking to decide, or even to intimate an opinion, whether the second clause, above referred to, does indeed impose a peremptory restriction, and such an one as can be practically enforced by the judiciary against the general taxing power delegated to the General Assembly, we may, for the sake of argument, admit that it is a restriction and constitutes one of the principles applicable to the taxing power of the counties, as referred to in the 4th clause of the 8th article. That article may then be read thus:

"The General Assembly shall have power to authorize the several counties and incorporated towns of this State to impose taxes for county and corporation purposes respectively; and all property shall be taxed according to an equal and uniform mode of taxation, to be general throughout the county; and no other or greater amount of revenue shall at any time be levied than may be required for necessary county purposes."

This exposition and interpretation of the fourth clause places the matter in the very strongest light contended for on the part of the appellants, and accords to them all the legitimate fruits of their argument upon this objection. It will readily be perceived, then, that the whole argument is narrowed down to the simple enquiry whether or not the act complained against, to wit: the subscription for shares of stock in the Georgia and Pensacola Railroad Company by the Board of County Commissioners of Leon

county is legitimately a county purpose, within the meaning of the said 4th clause of the 8th article of the Constitution. We think that it is, and, in order to demonstrate the correctness of this conclusion, it may be proper to note the difference existing between the ordinary expenses of the State and county organizations. While the ordinary expenses of the former are mainly induced by the necessary support of the officers required to conduct the business appertaining to the three great departments of the government respectively, that of the latter is confined almost exclusively to the improvement of the social condition of the citizens, there being no salaried officers to support. The Constitution does not attempt to give a definition to the term "county purpose," and to obtain a correct interpretation of that phrase we must look to the contemporaneous legislation upon that subject and the uniform action of the county courts under the territorial government. By this reference it will be abundantly demonstrated, that at that day county purposes were taken to embrace principally the erection and repair of court houses and jails, the opening and maintaining public thoroughfares within the limits of their respective counties, by opening roads, building bridges and causeways, and keeping the same in repair, licensing and regulating ferries and toll-bridges, &c.

It is thus seen, that the entire subject of highways was at the time of the constitution, an object peculiarly within the jurisdiction of the county authorities, and we are hence warranted in the assumption that it was so understood by the Convention when they used the phrase, "county purposes." But we do not understand the appellants to differ from us in this interpretation, when applied to ordinary roads and bridges through a county—the objection is, only when it is sought to apply it to a "*Railroad.*" Upon what sound principle this particular species of thorough-

fare is to be withdrawn from the interpretation of the phrase before referred, we are at a loss to perceive. Surely it will not be seriously contended that while the County authorities are permitted in the erection of their court houses and jails, to avail themselves of the improvements in architecture brought about by the advancement so rapidly going on in the arts and sciences, they shall be precluded from availing themselves of the benefits resulting from the most magnificent discovery of the age. With almost as good reason might it be insisted, that they should confine their citizens to treading the tortuous windings of the Indian's " trail" or to the little less primitive thoroughfare of the Pioneer's " bridle way." But not to do injustice to the argument of the appellants, we remark that the objection seems to be, not so much to the particular nature of the work as to the fact, that it is not wholly confined within the territorial limits of the county, and was therefore not embraced in the phrase " county purpose." The counsel who closed the argument for the appellants, contended that the test to be applied to the work as determining its character in this respect, was its locality, while the counsel for the respondents insisted that the true test was to be found in the anticipated *benefits*. We think that neither the one or the other of these tests, taken by themselves, will furnish the correct rule, but as a general rule that it requires a concurrence of both, for it will readily strike the mind of every one, that a great enterprize may be embraced entirely within the limits of a county, and therefore exclusively *local*, without in the slightest degree being entitled to the distinctive character of a county purpose. While on the other hand, another enterprize though entirely without the county limits, may confer innumerable *benefits* upon, and advance the best interests of the county, with as little claim to the character of a county enterprize. Indeed it would

be as unprofitable as it is dangerous to attempt to prescribe any definite rule to be looked to as furnishing the correct test on this subject. It is better not to essay to circumscribe by fixed rules, that which no human intellect can fully embrace. Wisdom would counsel, that each case of this kind should be decided as it may arise, untrammelled by the decision of the preceding one.

Another argument used to show that the object contemplated by the county subscription does not come within the meaning of the phrase " county purpose" was that the corporation whose stock was subscribed for, was a private corporation. We do not think the argument at all conclusive, for though it be true that the Georgia and Pensacola Railroad Company be a private corporation, yet the stock purchased by the county is certainly public property, and belongs to the citizens of the county, in the proportion of their respective contributions by way of taxes. In further elaboration of our views on this subject, we take it for granted that no one would seriously contest the right of the county to construct a Railroad to be located wholly within her territorial limits, provided she possessed the means of herself. Now, if this be admitted, then the point is yielded as to the character of the *object* to be attained, and the only question that can arise, is, as to the lawfulness of the *means* to be employed. In this view of the case, we can discover no objection in the absence of the ability in herself to effect the object, that she should invite the co-operation, not only of contiguous counties, but even of individual capital and enterprize.

The two objections now under consideration, viz: that the purpose of the subscription was not a " county purpose,'' and " that the corporation through whose agency the road was expected to be built was a private corporation," both came up for consideration in the case of Nicol et al. vs.

Mayor and Aldermen of Nashville, 9 Humph. R., 252, and were so fully discussed, that we feel ourselves constrained to cite somewhat at large from the report of the case. The Judge who delivered the opinion in that case, after stating the two objections, goes on to remark : " This 29th section of the second article of our Constitution provides, that the General Assembly shall have power to authorize the several counties and incorporated towns in the State, to impose taxes for county and corporation purposes, respectively, in such manner as shall be prescribed by law; and all property shall be taxed according to its value, upon the principles established in regard to state taxation." It may here be noted that this provision in the Tennessee constitution is almost in the very words, and certainly embodies the very spirit of the provision contained in the 4th clause of the 8th article of our constitution. The Judge goes on to say " the reason why this clause was embraced in our constitution,¡ those contemporaneous with its formation know to have been, that doubts had been suggested by the highest Judicial tribunal of the State, as to whether the taxing power could be delegated by the Legislature to the counties, and to the incorporated towns, and the clause was intended to remove these doubts." Addressing himself particularly to the points under consideration, he proceeds —" Is the making of the road from Nashville to Chattanooga a corporation purpose of the town of Nashville? What is a corporation purpose of the town of Nashville? General definitions, are always difficult to be given with precision and accuracy, especially where they have to cover as extensive ground as that embraced by the expression, " corporation purposes." I shall therefore not attempt to specify what are corporation purposes of the city of Nashville; they are and may be made to be as numerous and diversified as may be found requisite by experience, to pro-

mote the peace, comfort and prosperity of its corporation, and anything which promotes these things, is or may be constituted a legitimate corporate purpose." * * * "Such are all facilities of canals, roads, the improvement of rivers, by which their navigable use is extended, by all which the commercial interests of a town is increased and expanded by reason of the increased facilities of communications thus furnished, by means of which, the wealth of its populators individually and collectively is increased with a consequent increase of the comforts and enjoyments of life."

It is true these improvements must have some connexion with the corporate town claiming them as corporate purposes more direct than that which would result from the general increased prosperity of the country by reason of such improvements, made without a direct reference to or indirect connexion with the town. That is, the improvement claimed to be a corporate purpose, of the character under discussion, must have such relation to the town as to be the medium through which this prosperity is attained. It must begin or terminate at the town, or pass through or so near to it as to be capable of effecting its direct interests. It would seem to be an incontestable truth, that a corporate town, is deeply interested in the making of any road or other means of transportation and travel whereby the facilities of its commerce are increased—and, if it be so interested, why shall it not become a corporate purpose to have them made ? It would really seem almost useless to argue in favor of it. Is there anything illegal in it ? Is there anything against good morals in it ? Is there anything against public good in it ? Surely not. A town is situated ten miles from a navigable stream. It is obvious that it would be a matter of great importance to the town, its commerce and general prosperity, to have a railroad or McAdamized road to the river. It concerns no

one else but this town, and no one else will make it. Shall it not become a corporate purpose of this town to make it, if it be able ? Surely no one will deny but that it may."* * * "If a corporation may make the road, may it not join with others to make it ? If the undertaking be too expensive to be carried into execution by the corporation itself, or, if others be desirous of uniting with it for the effectuating of the design, why may they not unite ? Again, it may be asked, is there anything wrong in this ? Is there anything against the public good in this ? Is there anything against law in this ? Surely not."

These views are so smply and forcibly expressed, and at the same time are so pertinent to the points under discussion, that we have, at the hazard of extending this opinion to an unreasonable length, deemed it profitable to refer to and cite them fully.

Slidell, C. J., of the Supreme Court of Louisiana, expressed similar views upon the same point, which arose in the case of Police Jury vs. Succession of McDonough, (8 Louisiana An. Reports, 341,) which was decided as late as the year 1853. Referring to the enquiry what are *county purposes*, he remarks : " This question is not a new one ; on the contrary, it has been frequently subjected to rigorous judicial investigation, and its answer may be satisfactorily found in the illustrations which are presented in decided cases. Thus, in the case of Goddin vs. Crump, 8 Leigh's Virginia Reports, the improvement of James and Kanawha rivers was considered, as regards the city of Richmond, a local purpose by reason of its connexion with the commercial prosperity of that city."

After citing the observations of Tucker, J., in [the last foregoing case, and several others to the same point, he proceeds to express the following enlightened views : " If the decisions cited be true exponents of the law, as we

think they are, their application to the present case is obvious. The contemplated railroad passes through the territorial limits of this corporation and has one of its *termini* there. If the enterprize is successful, the results which have been experienced in other towns and sections of the Union may be realized here. Its facilities of commerce may be enhanced. An impulse to industry within its limits may be given—its population augmented—its lands rise in value. Whether these prosperous results will ensue, is in the womb of the future. But it is evident that the Legislature expected them, and it is clear that the police jury and a majority of the voters so thought. The Legislature plainly declared such an enterprize to be within the range of their corporate purposes. The police jury, acting under the legislative sanction, declared by their ordinance their opinion that the measure would conduce to the interests of their locality, and a majority of the tax-payers have concurred in that opinion. Whether their expectation is false or well founded is not, under such a state of legislation, a judicial question. We take it to be a well settled principle, that if the Legislature can constitutionally exercise a power, it is to be presumed by the judiciary, in just deference to a co-ordinate branch of the government, that in the particular case it was exercised discreetly and with a deliberate and just regard to the interests of its citizens."—(Citing the opinion of C. J. Shaw, in the case of Norwich vs. The County Commissioners, 13 Pick, 62.)

We might cite several other cases, going to illustrate the meaning of the term " county purposes," but we deem the foregoing sufficient to warrant us in declaring the act of subscription to the capital stock of the Georgia and Pensacola Railroad Company, by the Board of County Commissioners of Leon county, to be fully within the letter and spirit of that phrase.

Cotton et al. vs. The Co. Commissioners of Leon Co. et al.—Opinion of Court

It was urged with much earnestness at bar, that the word "necessary," in the connection in which it occurs in the 2nd clause of the 8th article of the Constitution, and by implication transferred to the 4th clause of the same article, qualifies the term "county purposes" occurring in the latter clause, and that it ought to exercise a potent influence in determining the true meaning of that term. It was argued that the word *necessary*, in this connection, must be taken to limit the action of the county authorities to such purposes only as were *indispensable* to promote the interests of the county. In other words, that it restrained their action to the superintendence of the *ordinary* affairs of the county. However this may be when applied to the expenses of the State government, (of which we desire to intimate no opinion,) we are very clear, that as applid to the counties, the term does not have the effect contended for. The word *necessary* is an adjective possessing degrees. A thing or purpose may be necessary, more necessary, indispensably necessary. An object simply necessary to subserve the interests of a county is as much a "county purpose" as though that object were indispensably necessary. We do not see that a reference to the term furnishes any light to the interpretation of the phrase "county purpose," or that it serves in the slightest degree to fix or limit the true meaning of that phrase. If, indeed, it had any distinctive meaning in the connection to which it is sought to apply it, (and we are rather of the opinion that it has,) we are inclined to think that that meaning is precisely the reverse of that contended for in the argument for the appellants, and that it is rather the indication of a grant of discretionary power, to be exercised by the county authorities within the appropriate limits of their general powers, than a restraint upon those powers.

As pertinent to the matter under discussion, we cannot

14

more forcibly express our views than by citing the very lu-
cid comments of Chancellor Kent upon a kindred subject,
to wit : the constitutional powers of the Federal Govern-
ment. We remark incidentally however, that while we
fully adopt the logic of the distinguished commentator, we
by no means desire to be considered as sanctioning his ap-
plication of it. The reasoning may be perfectly sound
when applied to a government of general powers, such as
is our State government, and yet wholly fatal and incon-
clusive when applied to a government possessing only
enumerated powers, such as is the Federal Government.
He says—" The constitution has not left the right of Con-
gress to employ necessary means for the execution of its
powers to general reasoning. It is expressly authorized to
employ such means ; and *necessary* means, in the sense of
the constitution, does not import an absolute physical ne-
cessity so strong that one thing cannot exist without the
other. It stands for any means calculated to produce the
end. The word necessary admits of all degrees of compar-
ison· A thing may be necessary, or very necessary, or ab-
solutely and indispensably necessary. The word is used in
various senses, and in its *construction* the subject, the con-
text, the intention, are all to be taken into view. The pow-
ers of the government were given for the welfare of the na-
tion. They were intended to endure for ages to come, and
to be adapted to the various crises of human affais. To pre-
scribe the specific means by which government should in
all future time execute its powers, and to confine the choice
of means to such narrow limits as should not leave it in the
power of Congress to adopt any which might be appropri-
ate and conducive to the end, would be most unwise and
pernicious, because it would be an attempt to provide by
immutable rules, for exigences which if foreseen at all must
have been seen dimly, and would deprive the legislature of

the capacity to avail itself of experience or to exercise its reason and accommodate its legislation to circumstances. If the end be legitimate and within the scope of the constitution, all means which are appropriate and adapted to this end, and which are not prohibited are lawful." 1 Kent Com. 252. Thes views are as logical in expression, as they are beautiful in conception, and appropriately applied, are overwhelmingly conclusive. We belong not to the latitudinarian school, but our every lesson on the subject of government has taught us to discriminate the distinctive elemental nature of the Federal and State organizations. While the one is simply a confederation of separate and independent political sovereignties, each striving for the mastery—the other is the pure embodiment of the will of the people, and constitutes a unit.

Accustomed to witness the ceaseless conflicts of opposing powers, whether our eyes be turned to our own Federal organization, or to the monarchical governments of Europe, we have learned to give expression to our political jealousy without duly considering the appropiateness of its application. Here under our State government we have no exacting John—no jealous and determined Baron. The people's breath creates the sovereign. The people's breath can demolish it. All these harsh epithets then, so richly abounding in one of the dissenting opinions, cited at the argument of this case—such as "piracy," "licensed robbery," "spoliation by a dominant faction," and the like, we conceive to have been uncalled for, in the connection in which they are to be found, and are to be admitted, rather for spiciness, than for their rhetorical taste or political applicability.

Another objection urged against the validity of the act of subscription to the stock of the railroad company, and one that at the first blush is rather imposing and plausi-

ble, is, that by the terms of the statute its operating vitality was made to depend wholly upon the votes of the people. The position assumed in the argument was, that this act of submission amounted in fact to a virtual delegation of the taxing power to the people, and therefore a clear violation of those clauses of the Constitution which confines the exercise of that power to the General Assembly, and by their permission to the respective county authorities. If the view taken of this subject by the appellants were correct, and it be true that the act in question does delegate to the people the authority to make subscription and the consequent power to levy taxes to pay for the same, we have no hesitancy in declaring such an act of the Legislature to be a palpable infraction of the Constitution, and one that would demand the prompt interposition of the judiciary. It would clearly be changing the essential character of our political institutions by converting a representative government into a pure democracy. But such is not the view which we have taken of the provision in that act. We can discover nothing in it which bears even a semblance to a delegation of legislative power. The only operation of that provision is to obtain, in a perfectly legitimate mode, the expression of the will of the constituent as a guide for the action of the representative. Is there anything in this violative of the principles of republican government, or abhorrent to our ideas of popular rights? Indeed, if there be one principle of government more jealously maintained—one more earnestly insisted upon—one of more universal acceptation than another—it is, that "the representative is bound by the will of the constituent." This principle constitutes the foundation of all representative governments; and there are those now on the stage of action who vividly remember the shock that was given to the popular mind when a

high functionary of the Federal Government, some years since, gave utterance to the sentiment, "that the arm of the representative ought not to be palsied by the will of his constituents." We have looked into the act critically, with a view to ascertain if it is in fact obnoxious to the objection under consideration. After authorizing the Board of County Commissioners of any county to sub-scribe for the stock of such railroads as are therein referred to, the act contains a proviso in these words : " *Provided*, It shall be first submitted to the vote of the legal voters of said county, city or town, to be held and taken at such times and places and in such a manner as said authorities respectively may appoint, whether or not stock shall be taken ; and, if when the vote be thus taken, it shall appear that a majority of the voters shall be in favor of such sub-scription, it shall thereupon be lawful for the Board of County Commissioners, city or town authorities, by agents by them appointed, to subscribe and take in such com-pany such an amount of stock as they shall determine." It will be readily perceived, by a close attention to the phraseology of this proviso, that even should the vote be favorable to the subscription, there is no *express* mandate in it making it the duty of the commissioners to subscribe. So far as the *letter* of the law is to determine its operation, it is very clear that a *discretion* is still left with them to refuse. How far, in this particular, the *spirit* of the law shall control its letter, we do not undertake to decide, or even to intimate an opinion. But, be this as it may with regard to the *act* of subscription, we think there can exist no reasonable doubt but that *the amount* of subscription is still within the discretion of the Board of Commissioners, unaffected by the vote of the people. If we are correct in this construction, then it results undeniably that the vote contemplated by the proviso can, in no proper sense, be

deemed to be an act of legislation. As upon the points hereinbefore discussed, we have upon the one now under consideration an array of precedents which conclusively settles the lawfulness of such a submission to the popular vote, whether it be objected to as "the delegation of legislative power," or as an act of "conditional legislation."

In the case of Police Jury vs. Succession of McDonough, before referred to, this very point was discussed and settled. The court say : " Is such a submission really inconsistent, as was suggested at bar, with the genius of our institutions? If the Legislature could constitutionally confer on the Police Jury authority to pass a taxing ordinance, it would seem rather a safeguard against oppression, than the reverse, to qualify the power of requiring it to be exercised, with the approbation of a majority of those who are to bear the burden."—(Citing De Tocqueville, p. 65; White's Dig. of the Laws of Mass., 1147; 2 Gill's Reports, 19; 7 vol. West., L. J., 22; 8 Barr, 395; 10 Barr, 216.)

The same point arose in the case of the Cincinnati, Wilmington and Zanesville Railroad Company vs. the Commissioners of Clinton County, hereinbefore referred to, and it was similarly decided in favor of the law. In Kentucky, the precise point was ruled in the case of Talbot vs. Dent., 9 B. Mon., 526, and afterwards affirmed in the well considered case of Slack vs. The Maysville and Lexington Railroad Company, decided in 1851 and reported in 13 B. Mon., 1. This precise point has frequently been before the courts in all its various phases, and, with scarcely an exception, has been uniformly ruled in favor of the law. But, if further authority be deemed necessary to put the question at rest, we refer to the concurrent action of the Federal Government and the State of Virginia with regard to the retrocession of the county of Alexandria, in

the District of Columbia. The act of Congress of the 9th July, 1846, submitted the question of a retrocession to a vote of the qualified electors of that county. Virginia had previously enacted a law signifying her willingness to receive back the county whenever the Congress of the United States should see proper to retroceed the same. Congress enacted the law of the 9th July, 1846, submitting the question of retrocession to the qualified voters of the county, providing the machinery for the election, and enacting, that if a majority of the voters should be against accepting the provisions of the act, it should be void and of no effect; but if a majority should be in favor of accepting, then it should be in full force; and, in that event, it should be the duty of the President to inform the Governor of Virginia of the result, and that the law was consequently in force. After stating the facts of that case, the Supreme Court of Pennsylvania forcibly remarks: "Many of the most profound constitutional lawers of the Union were in Congress at that time, and the State of Virginia never hesitated to accept the retrocession, because the Congress of the United States delegated to the people the decision of the question. This act, under all the circumstances, must, therefore, be considered high authority as a precedent in the development of the constitutional functions of the legislative power."

It was further objected against the validity of the act of our Legislature, that by the terms of the 22d section, it was provided that each tax payer of the county should receive a remuneration in the shape of stock in the Railroad Company, equivalent to the amount of his assessment, and the position was assumed that this provision was a clear infraction of the 1st and 14th clauses of our "Declaration of Rights" which were intended to secure to the citizen, the right "of acquiring, possessing and protecting property."

**636**  SUPREME COURT,

Cotton et al. vs. The Co. Commissioners of Leon Co. et al.—Opinion of Court.

Fortunately for us, this is not a point now for the first time to be decided. It has been made in several of the many Railroad cases which have arisen in the States of the confederacy, and has uniformly been adjudged in favor of the law. Without indulging in an argument of our own on this point, we will content ourselves with short extracts from the opinions in the two cases of " Police Jury vs. succession of McDonough" and Talbot vs. Dent, before referred to in this opinion.

In the first of the above named cases, the court says :— " the objection made to the law upon the ground that the stock subscribed for by the respective police juries is to go to the tax payers, as provided in section 4th, seems to us untenable. In the undestanding of practical men, this is surely no grievance. Its manifest object was to lessen the burden of the tax-payer. If the stock should prove worthless it imposes no additional burden upon the holder ; it involves him in no further responsibility. But if the stock should prove valuable, such value would be so much taken from the tax."

In the case of Talbot vs. Dent, the Supreme Court of Kentucky says—" It is true it is somewhat an anomily for the governing power to levy a tax for a particular purpose and at the same time, in a measure, reimburse him by the transfer of the thing paid for by the tax ; still if the government were under a valid obligation to pay, and had the right to meet this obligation by a tax upon its citizens, a contribution rateably assessed and levied for this public object, upon all the property of the citizens, would not lose its character of a tax, nor be less obligatory upon individuals, because the payment of it would entitle them respectively, to corresponding portions of the thing for which the government had contracted the debt or obligation, for the discharge of which the contribution was required." These

views are so logically and forcibly expressed, and the matter placed in so simple a light, that we deem it a work of supererrogation to add to them.

It was further objected at bar that the provision contained in the 22d section of the act of 1855, which authorized the counties to issue bonds for the purpose of raising the money necessary to pay for the stock purchased, was an infraction of the 13th clause of the 13th article of the constitution, which expressly prohibited the General Assembly from pledging the faith and credit of the State, to raise funds in aid of any corporation whatsoever. The argument was this, that the letter of the clause confined the prohibition to the State only, yet its *spirit* made it applicable to, and equally binding upon the counties. We have before declined to determine how far a restriction plainly applicable to the exercise of power by the Legislature, shall be taken to affect the county, but for the sake of the argument are willing to admit the position assumed, viz: That all the restrictions of the constitution which are expressly applied to the legislative power of the State, are equally binding upon the legislative powers of the counties. With the full advantage of this admission, however, we do not. see that the objection urged is at all strengthened, for there is nothing in the provisions of the section referred to that authorizes the Board of County Commissioners to " pledge the faith of the county to raise funds in aid of any corporation whatsoever." By an attentive reading of that section it will be seen that the bonds therein authorized to be issued, are not intended to raise funds " in aid of the corporation," but expressly to provide the means by a disposal of the same, *to pay for the stock so to be purchased.*— And it is equally apparent, that the authority to " pledge the faith and resources of the county," is to give credit to those bonds only, and not for the benefit of the company,

or for any other purpose whatsoever. We think therefore that the objection, however forcible it might be in the state of case assummed, does not apply to the law now under consideration.

We have thus, at some length, gone over the several objections alleged in argument against the validity of the particular section of the act referred to. We have given to the objections and to the arguments in support of them the most deliberate consideration. We have taxed to the uttermost extent all our powers of discrimination. We have resorted for light to all of the decided cases within our reach. We have scrutinized with anxious care and attention the powerful reasoning of the many able jurists, whose opinions are to be found in the books of reports, to discover, if we might, the great *desideratum*, truth; and, after the most laborious investigation, we are constrained to pronounce the particular section of the act in question to be perfectly compatible with the provisions of the Constitution, and therefore valid. If we should have erred in this conclusion, it will present an extraordinary instance of a most singular fatality attending the adjudication of a great constitutional question; for, it may be noted as a pregnant fact, that as often as the questions involved in this case have arisen for adjudication, they have received but one determination, and that in accordance with the conclusion arrived at in this case. The courts of Virginia, Massachusetts, Connecticut, Pennsylvania, Ohio, Kentucky, Tennessee, Mississippi and Louisiana all hold the same uniform language upon this subject; and if there be a single adjudication in opposition to our conclusion, as announced in this case, we have failed to have it brought to our notice. In the face of such an overwhelming and imposing array of authority, it would indeed have been most extraordinary, even if our own reasoning had tended.

to conduct us to an opposite conclusion, not to have raised in our minds a serious *doubt* as to the correctness of that rea soning; and we are taught by the lessons hereinbefore in- culcated in regard to the appropriate function of the judi- ciary, that whenever, in the examination of a great constitu- tional question involving the exercise of powers by a co-or- dinate branch of the government, a rational doubt arises as to the validity of any particular act of that department, a proper and respectful regard and deference for the same would dictate an affirmation of the act.   In the beautiful and forcible language of an eminent jurist, before referred to, "If a court, in such a case, were to annul the law while entertaining doubts upon the subject, it would present the absurdity of one department of the government over- turning in doubt what another had established in settled conviction, and to make the *dubious constructions* of the judiciary outweigh the *fixed conclusions* of the General Assembly."

In order, however, to break the force and weaken the authority of the decided cases, it was suggested at bar that those cases were adjudicated under constitutions essen- tially differing from ours; that the restrictions upon the legislative power to be found in our Constitution are more stringent than those imposed by any of the Constitutions of the several States where those adjudications have been made, and that, therefore, they ought not to be considered as authority in this case.

We have carefully examined the several State constitu- tions alluded to, and have not found that difference to ex- ist, which is contended for.   In the majority of them, we find the restraints upon the legislative department equally stringent, with those imposed by our own ; and in several of them, they are even more stringent.

Let the decree of the Chancellor be affirmed with costs.

BALTZELL, C. J., delivered the following dissenting opinion:

Differing with the majority of the court in their views expressed in this case, I proceed to give the reasons that operate with me for holding the adverse opinion. The county of Leon has imposed a tax to pay a subscription of stock to this company, which is complained of as unconstitutional. By express provision of the Constitution, the principles established in regard to State taxation are made to apply to the counties when imposing [taxes. Art. 8, sec. 4, Cons.

Those principles are declared to be "equality and uniformity in the mode of taxation."—Sec. 1. 2ndly, "That no other or greater amount of tax or revenue shall at any time be levied than may be required for the *necessary expenses of government*."—Sec. 2. 3dly, "No money shall be drawn from the treasury but in consequence of an appropriation by law, and a regular statement of the receipts and expenditures of all public monies shall be published and promulgated annually with the laws of the General Assembly."—Sect. 3. 4thly, "The General Assembly shall not pledge the faith and credit of the State to raise funds in aid of any corporation whatever."—Act 13, sec. 13. 5thly, "Private property shall not be taken or applied to public use unless just compensation be made therefor."—Art. 1, sec. 14. 6th. "The General Assembly shall have power to authorize the counties and incorporated towns of this State to impose taxes for county and corporation purposes respectively, and all property shall be taxed upon the principles established in regard to State taxation."—Art. 8, sec. 4.

These obviously provide a system and mode of action for the government, and regulation as well of the Legisla-

ture as of cities and counties. They impose upon them a duty of imperious and important character. They are, in the first place, before imposing a tax, to ascertain the "necessary expenses" to which the State, city or county may be subject, so as not to levy "any other or greater amount than may be required." When collected, the money is not to be withdrawn from the treasury except by appropriation; and, as a still farther security, they are all to publish a statement of their receipts and expenditures.

It is not required of me, I trust, to define the terms necessary expenses. They are clearly restrictive to an authority confided. They are terms of art, phrases well known in law in their application to trustees (the relation and capacity which the Legislature and these city and county officers hold to the people) as well as to executors, guardians and other officers. And their familiar use is in strict accordance with their legal acceptation. No one confined to necessary expenses regards himself at liberty to expend as largely as he would if relieved from such restraint.

Passing by the general question of the right of a county to construct a railroad, to be discussed hereafter, the question arises whether the construction of this railroad is a necessary expense of the county of Leon? If it be so, then the law is in strange conflict with itself. It leaves to the option of a majority of the citizens to say whether the expenses shall be encountered—not that they are necessary. Now, this very option and choice is irreconcilable with the idea of necessary expense. If it was a fair expense, a necessary expense of the county, there was no option about the matter, and the Legislature should have directed peremptorily the discharge of the duty, and, indeed, without a special law, the county authorities should have provided for it under the general authority confided

642          SUPREME COURT,

to them. If a necessary expense, there was no permission required, no sanction needed. Can a trustee refuse to meet a necessary expense of the trust confided to him; an executor of his estate; a guardian or parent a necessary expense of his ward or child? Is it at the option of any of these to refuse to meet a necessary expense, to provide for or reject it at pleasure? It may be requisite, in case of unnecessary expenses, to ask such permission. In case of necessary expenses there is none, and courts invariably compel their allowance and payment.

A still more definite enquiry is presented on this point.

By referring to the original charter of this Company passed in 1853, we find that they have authority to construct a road "from the city of Pensacola or any other point or points on the waters of the Pensacola Bay in Florida, and running thence in an easterly direction to the western or southern boundary line of the State of Georgia." By an amended charter in 1855, they have "power to build an extension of their road to a junction with the Florida, Atlantic & Gulf Central Railroad, at or in the vicinity of Alligator, Columbia County,, and in case of their failure to construct their road to Alligator by the time the Pensacola and Georgia Railroad constructs its to that point, then to a junction East of Alligator, or to the Florida Railroad on the most practicable route to Jacksonville on the St. John's river with an extension from a suitable point in Columbia County in a southern or southeasterly direction, to a suitable point of junction with a road which may be built from Amelia Island, on the Atlantic to the waters of Tampa Bay in South Florida. Also an extension to Crooked River at White Bluff on Apalachicola Bay in Middle Florida, and an extension to the waters of St. Andrews Bay in west Florida, also travel roads to the County Sites of Jefferson, Gadsden, and Jackson Counties, and to the Alabama

Colton et al. vs. The Co. Commissioners of Leon Co. et al.—Opinion of Court.

line from suitable points West of the Alabama river."—
Now will it be said that the construction of a road between
the points here designated, (for this is the true question in
the case,) is a necessary expense of the County of Leon.—
It is not perceived what necessity there is of a citizen of
the County of Leon to have a road to and from these vari-
ous points to Pensacola, to the Georgia line, to Alligator, to
Jacksonville, to Tampa, to St. Andrews Bay, to Apalachi-
cola Bay, and to the Alabama line.  Could he desire to
transport himself or his cotton or other produce over such
routes ?   A road without any beginning or end—a road
with its work commenced in the middle, pointing by its
charter for its termini to the four points of the compass,
but with no distinct indication where it is to go, where to
begin, or where to end.   And this is a necessary expense
to a County having already without taxation, a railroad of
only 20 miles in extent to the Gulf, giving her immediate
and direct connection at all seasons of the year by steam
boats and ships with every part of the civilized world.—
Having unexampled advantages for transportation already
secured, it is yet a necessary expense to get other com-
munication, more expensive and more distant.

The expense of the construction of this road to these
points, will probably reach 10 millions of dollars, yet to
meet this necessary expense, the County has subscribed
$100,000, a hundredth part of the sum required.

If a necessary expense of the County, why is it that she
does not execute the work through her own officers ? Why
is it not her enterprise?  Why does she not control, direct,
supervise and manage it ?  Why not employ agents and
workmen, pay and discharge them? If a necessary expense
of the county, there is a commensurate liability. The very
fact that others own the road and its appendages, have the
superintendance, control, management and direction with-

out responsibility to the county authorities for disbui sement of the funds, or failure to accomplish the work, or for employing incompetent agents, shows that it is an expense of others and not [a necessary expense of the County of Leon.

To sustain the constitutionality of the law, the majority of the Court quote from Kents commentaries an interpretation of the word " necessary." This is not the logic of Chancellor Kent. The whole passage is taken almost verbatim from the opinion delivered by the Supreme Court of the U. S. in the case of McCullough vs. the State of Maryland. There, the question was as to the constitutionality of the act of Congress establishing the Bank of the United States, which depended upon the grant made by the Constitution of the power to Congress " to make all laws which shall be necessary and proper for carrying into execution the foregoing laws," such among others as to regulate commerce with foreign nations—to declare war, maintain a navy, &c. It was in reference to this grant, the Supreme Court held that Congress was not confined in the choice of means, and that the words necessary means such as they thought proper to adopt. But the Chief Justice qualified the opinion with the following remarkable language to which we invite particular attention : " The clause is placed among the powersof Congress *not among the limitations on these powers.*" " Its terms purport to *enlarge* not *to diminish* the powers vested in the Government. It purports to be an *additional* power not a *restriction* on those already granted." Again, " if their intention had been, by this clause, to restrain the free use of means which might otherwise have been implied, that intention would have been inserted in another place and would have been expressed in terms resembling these, " *In carrying into execution the foregoing powers, and all others, &c., no laws shall be passed but such as are necessary and proper.*" Had the intention

been to make this clause restrictive it would unquestionably have been so in form as well as in effect." McCullough vs. State of Maryland, 4 Cond. Rep. 481.

Except an express decision upon the case itself no language could have been more appropriate, none more decisive of the very points at issue. Here we have limitation, restriction and dimunition. The Florida Convention seems indeed to have assumed this identical position as if acting on the very suggestion, only presenting it in more definite, explicit, and emphatic shape. For whilst the Chief Justice admits that if the words " no laws shall be passed but such as are necessary" had'been used, they would have limited and controlled the power, the constitution uses language more decided even, " no greater amount of tax shall be levied than may be required for the necessary expenses of government;" thus designating in precise language, not only the power to be used, but the special object in reference to which it shall be used, to which object it is strictly limited and confined.

I next proceed to enquire as to the operation of the clause of the constitution marked as the 4th, " that the General Assembly shall not pledge the faith and credit of the State to raise funds in aid of any corporation whatsoever."

The object of this is very clear, and its design very evident. By preventing the State from creating debts or giving its credit in aid of a corporation, the necessity of imposing taxes on the citizens to pay such debts and thereby redeem its pledge and sustain its credit is avoided. This principle is clearly established as to State taxation, and we have already seen, expressly applied to the counties and cities. If the question of the execution of bonds and pledging the resources of the counties were for adjudication, it would be difficult to escape the operation of

16

this provision. As it, however, does not arisé and is not presented by the record, I decline the expression of an opinion, content to wait until judicial action may render this an appropriate and lawful duty.

The fifth provision, " that private property shall not be taken and applied to public use, unless just compensation be made therefor," has great weight with me, and but for 'the authorities holding a different view, I should regard it as conclusive. That the property of the citizen is taken by force of this law is very clear. It is also to be applied to some use, either public or private. It is to be given to the corporation, so that the question arises whether the corporation is public or private. The distinction between public and private corporations is well established, and has reference to their powers and the purposes of their creation. "They are public when created for public purposes only, connected with the administration of the government, and where the whole interests and franchises are the exclusive property and domain of the government. Over these the Legislature has power, not limited by the Constitution, to impose such modifications, extensions or restraints as the general interests and public exigencies may require, without infringing private rights. All corporations invested with subordinate powers for public purposes fall within this class and are subject to legislative control. All other corporations are private. They exist by legislative grants, conferring powers, rights and privileges for special purposes. These grants are essentially contracts which the Legislature cannot impair or change without the consent of the corporation." Ang. & Ames' Corp., 927–'28; Dart. Col. vs. Woodward, 4 Wh., 578.

This corporation is then a private one, and money or property of the citizen taken and applied to its use is appropriated to a private use, and thus a question of most

serious import arises, whether the property of the citizen
may be taken by the State and applied to the use of some
other private party.   On this subject the higest tribunals
of the country and most eminent jurists have expressed
themselves in emphatic language.   The Supreme Court of
the United States say " that government can scarcely be
deemed to be free where the rights of property are left ·
solely to the legislative body without any restraint.   The
fundamental maxims of a free government seem to require
that the rights of personal liberty and private property
should be held sacred.   At least, no court of justice in this
country would be warranted in assuming that the power
to violate and disregard them—a power so repugnant to
the common principles of justice and civil liberty—lurked
under any general grant of legislative authority, or ought
to be implied from any general expressions of the will of
the people."  2 Peters, 656.   It has never been allowed
(says a distinguished member of the Court of Errors of
New York) to be a rightful attribute of sovereignty in any
government professing to be founded on fixed laws, how-.
ever despotic the form of government might be, to take
the property of one individual or subject and bestow it
upon another.   The possession and exertion of such a
power would be incompatible with the nature and object
of all government; for, it being admitted that a chief end
for which government is instituted is that every man may
enjoy his own, it follows necessarily that the rightful exer-
tion of a power by the government taking arbitrarily from
any man what is his own, for the purpose of giving it to
another, would subvert the very foundation principle upon
which the government was organized and resolve the poli-
tical community into original chaotic elements."  18 Wen-
dell, 56.

Now, what greater enormity, under the pretext of legal

authority, can be imagined than that of *compelling* this complainant to buy the stock of the railroad company at their own price, extorting from him a hundred dollars of his money for that which has no existence but on paper, which is of no use to him, which he does not want and which he regards of not the slightest value. Is he not equally entitled, upon principles of reciprocity, to have this company forced to buy his property at his own price, although it be of no use or value to them? But this they would say is clearly illegal and manifestly unjust. Be it so ; then indeed the corporation and citizen do not stand on equal grounds. The Constitution expressly protects the citizen against monopolies—the injustice and oppression of granting to favored individuals the "sole buying, selling, making or using a thing." Yet, it is insisted that this company have not alone the exclusive right to sell, but to force their stock, at their own price, upon unwilling purchasers, pretending to make contracts, to give certificates of sale, whilst every principle held sacred between citizen and citizen in making such arrangements is violated and disregarded. Consent between them is regarded as a main and indispensible ingredient. Here it is quite indifferent, and a bargain is made for the citizen, with no option on his part but to pay his money or have his property sold by the sheriff.

" All freemen are declared equal by our Constitution and to have certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing and protecting property and reputation."

Can it be that the right of possessing and protecting property does not exist as against a corporation? Is a proposition to be tolerated, or course of reasoning to be sanctioned which either in its terms or in its conclusions

Cotten et al. vs. The Co. Commissioners of Leon Co. et al.—Opinion of Court.

would secure to a corporation superior privileges, or guaranty to it greater rights than those enjoyed by the citizen? Assure protection to a corporation which is denied to the citizen—a protection not of natural persons but of fictitious beings, not of individuals, but of a class—create not merely aristocratic distinctions, but an oligarchy of wealth, the most odious of all influences and the most antagonistic to the essence of free institutions.

In connection with this it may be appropriate to refer to the action of the constitutional convention to shew the disposition of that body, and the importance attached by it to the provisions as to taxation.

The report made by Judge Thompson as chairman of the Committee on Taxation and Revenue, section two, (being the 5th of the report,) was in these words: that "no other or greater amount of tax or revenue shall at any time be levied, than may be required for the necessary *current* expenses of government." Journal, p. 29. " Mr. Wyatt moved to strike out the word *current* and the ayes and nays were ordered, and were, ayes 29, nays 27, the motion therefore prevailed." P. 65.

"Mr. McCants moved to amend section 5 by inserting at its close " unless by two thirds of the General Assembly," which was lost." P. 66.

" Mr. Baltzell moved to strike out the 5th section which was decided by yeas and nays, as follows:

" Yeas—Messrs. Allen, Anderson, Baltzell, Bartlett, Bellamy of Jackson, Blount, Brown of Monroe, Brown of Leon, Cabell, Duval, Fitzpatrick, Hunter, Long, Malone, Marvin, Mays, McKinnon, McLean, McGhee, Meachem, Morton, Parkhill, Stephens, Taylor, Ward and Woodward—26.

Nays—Mr. President Gov. Reid, Messrs. Bellamy of Jefferson, Bird, Brooks, Bunce, Cooper, Crichton, Gary, Garrison, Haddock, Hooker, Jenks, Levy, McClelland,

McCants, Partridge, Read of Leon, Robbins, Roache, Sanchez, Semmes, Thompson, Watts, Webb, Westcott, White, Williams, Wood, Wright and Wyatt—30.

So it was *not* stricken out," p. 66.

Mr. Read of Leon gave notice that on the third reading of this article he should propose to amend the 5th section by adding " unless by the concurrent vote of two-thirds of the General Assembly."

" Mr. Thompson moved to amend the 7th section, (now section 4 of article 8,) by striking out in the 4th line, the words " according to its value" which was concurred in; page 60. The section stood in the report, " all property shall be taxed according to its value, upon the principles established in regard to State taxation." "

The necessity of such action on the part of the Convention is to be found in the history of the times, showing conclusively that it did not originate in a mere abstract theory of government, but from imperious necessity, induced by the results of bitter experience. The years 1835,–6,–7,–8, were periods of unparalleled suffering, embarrassment and distress throughout the United States. The several States of the Union with scarcely an exception, were involved through extravagant appropriations, wasteful and improvident expenditures, augmented by the aid afforded through Legislative action to individual and corporate enterprise. Their indebtedness on this account amounted to millions of dollars, threatening bankruptcy to them and ruin to individuals. The territories did not escape the common calamity. Florida, with her limited means, sparse population and limited resources, having scarcely the semblance of a treasury had issued bonds in favor of Banks to the amount of near four millions of dollars, pledging her faith, credit and resources for their redemption.

All these events and consequences had occurred before

the convention assembled, had been the subject of discussion through the press, in the Territorial Legislature and before the people, and had entered largely into the canvass for delegates to the constitutional convention. Its journals show that that body was occupied with this subject, which more than any other engrossed its attention. To prevent by timely precaution, directed to the evil, the re_currence of such consequences is the manifest spirit, purpose and design of the provisions we have cited. Whether the object has been effected by the remedy proposed depends upon the just construction of these provisions, some of which remain yet to be considered.

It has already been seen, that by the Constitution "the General Assembly had power to authorize the several counties and incorporated towns in this State to impose taxes for county and corporation purposes respectively, and all property shall be taxed upon the principles established in regard to State taxation." Article 8, sec. 4.

This clause is peculiar in its provisions—special, not general—is not a grant of power merely, but a grant connected with a designation of the mode and manner of its exercise and of the very object and purpose for which it is to be used. "The Legislature shall authorize the counties to *impose taxes*,"—not borrow money—not issue bonds— not pledge the faith and resources of the county. Nor is this grant deficient in affording the means to accomplish all the purposes for which it was designed. It was fully adequate and undoubtedly sufficient, through economy and prudence in the administration of the local affairs of the county, to attain the end desired, and, beyond this, a further object of great concern—to prevent waste, extravagance and profligacy in expenditures. This economy and prudence may be ensured by strictly confining the power of taxation to necessary expenses; but to authorize or permit debts to be

incurred or loans to be contracted would inevitably lead to the very result which it was the anxious wish of the Convention to prevent and avoid.

Nor can the power to borrow money be fairly inferred from a grant to impose taxes. This latter power "to lay and collect taxes, duties, imposts and execises, to pay the debts and provide for the common defence and general welfare of the United States" was expressly. given to Congress by the framers of the American Constitution, yet the power "to borrow money on the credit of the United States" was added. Sec. 8, Con. U. S.

If not admitted, or even regarded as doubtful, in the case of a government of the vast powers of the United States, how can such a power be implied for a mere corporate functionary, intrusted with subordinate duties only, almost wholly ministerial and executive in their character, indeed but slightly elevated beyond those of a commissioner of public roads. That the power would result as an incident—as in the case of the Legislature of a State, unrestricted in its high duties by constitutional regulation—is certainly unsupportable on any ground of right, reason, principle or authority. The right to borrow and make obligations is the act of a principal, not of an agent. To give to these functionaries such power by implication, is to alter and change at once the structure and character of their office and its functions. The wand of a necromancer scarcely effects greater, more wonderous and marvellous results. Instead of being charged with the raising a few hundred dollars annually, for repairs of court-houses, jails, bridges, &c., these authorities at once become, a manufactory of bonds creating debts to the amount of hundreds of thousands of dollars, for which the property of the citizens is mortgaged for payment. Surely there is no hazard in saying that the Convention never contemplated

nor authorized such action, and the language used by them gives neither warrant nor authority for its exercise.

Passing from this position, we perceive that the tax imposed by a county must be for a county purpose. Is the construction of this road a county purpose of the county of Leon? The court very frankly admit that the term "county purposes," as understood by the Convention, had reference to "the erection of court-houses and jails, the opening and maintaining of thoroughfares, by opening roads, building bridges and causeways, and keeping the same in repair, licensing and regulating ferries and toll-bridges," &c., &c., yet say "that the counties should not be precluded from availing themselves of the benefits resulting from the most magnificent discovery of the age." Conceding that on the score of utility, they should have this power, this by no means establishes the constitutional right to it. If the Convention did not give the power, how is it derived, the Convention alone being competent to grant it and the Constitution the authority under which it must be exercised? Can it be that the Legislature is authorized to confer the power and the court to sustain it, under the vague allegation that the counties should "not be precluded from its exercise?"

To allow the power, is indeed to amend the constitution so as to give the counties in addition to their ordinary functions the right to tax "to secure the benefits resulting from magnificent discoveries." But there is not plausibility even in such position. Railways and roads were in existence in the early part of the seventeenth century. The application of steam with success to carriages, which is the important matter as far as this case is concerned, was conceived at a later period, in 1784. Previous to this time animal power had been used on such roads. The Railroad rom Tallahassee to St. Marks had been in operation some

17

time before the session of the Convention. There is a consideration beyond this. How can it be maintained that a discovery in mechanics, repeals and overturns an important constitutional principle, nay a positive and peremptory restriction and denial of power? This would be in effect to make discoverers in science or mechanics, the framers of the fundamental law, and invested with the large power of its amendment. The Court does not see why if a county can construct a common road "this particular species of thoroughfare, is withdrawn from the interpretation of the phrase county purposes." With due deference, this presents a very imperfect view of the subject. It is not the power to make a road that is complained of. This is but one of very many means to an end and object, that object being the transportation of freight and passengers for pay, not by the county, but by private individuals using the money of the people of the county. The county authorizes this company to use the means raised by taxation, for the construction of the road, the making of warehouses, &c., the purchase of cars for passengers and freight, the employment of agents and superintendents, to make the road and use it afterwards for freight &c. A city may pave her streets with boards, iron, or stone, so that the transportation of freight or passengers may be as easy as on a Railroad. She may even make a railroad in all her streets. Can she purchase and own cars and locomotives and wagons to carry and transport freight and passengers for pay? When the Cumberland road was constructed by Congress no one dreamed of proposing to have agents to run stages and wagons by government. Obviously this is a private occupation, and a franchise and right as dear and as much entitled to regard as any other under the constitution. The duty of the government is to protect the citizen in his occupation, not destroy it by setting up a rival interest. A

planter having cotton or other produce to export, a merchant with goods, has a clear and indisputable right to his own mode of transportation, to his own wagons, and cannot be forced under the pretext of taxes, assessed in support of government, to buy other means of conveyance to belong to others, and to be used to the exclusion of his and maintained at his cost and expense.

No man in our free country, however limited his means, would withhold his proportionate contribution from the support of government. This sum is paid by him with cheerfulness and pride as the price of personal security, the protection of liberty, property and life—a tribute freely rendered in evidence of the high estimation in which the citizen holds constitutional rights and the benefits and blessings of free government. This sentiment it is certainly the policy of all governments to cherish as the surest guaranty of the loyalty of the citizen and of its own stability.

The subject of county purpose has yet another aspect. The direction in which the road is to be constructed agreeably to the charter has already been adverted to. Fairly considered, it would seem to be the work and purpose of the State, and not of a county, and especially of the county of Leon. Its extent, in its boundary, is only about thirty miles—through the State not less than five hundred. Its cost from four, five to ten millions—utterly beyond the means of the county—the direction of the road utterly at variance with any purpose of the county of Leon. If her commerce is desired to go to Fernandina, a road will not be wanted to the Georgia line. If to Pensacola, not to the Alabama line, and so as to other points. There may be design to build a road somewhere—to some of these points—in some direction—but I cannot feel myself justified in asserting that the road indicated by the charter is

a purpose of the county of Leon, in the sense contemplated by the Constitution. Nor is it sufficient, in the view I take of the subject, that some part of the road may be constructed, or that a road may be constructed within the limits of Leon county. The subscription is for the building of the road authorized by the charter, and there is no restriction upon the power of the directory to use the money of the people of Leon at one place more than another. They can apply it at Pensacola, at St. Marks, at some point on the Alabama or Georgia line, at St. Andrews Bay, or elsewhere, as they please.

But it is contended that the majority of the county, having by their vote sanctioned this assessment, this should be held conclusive. If the law is prohibited by the Constitution, as we think has already been established, the sanction of all the people and all the authorities of government, except in the mode prescribed by this instrument, will not avail. This is the very essence of a constitutional form of government. "A Constitution is a form of government instituted by the people in their sovereign capacity, in which just principles and fundamental law is established. It is the supreme will of the people, permanent and fixed in their original, unlimited and sovereign capacity, and in it are determined the conditions, rights and duties of every individual of the community. From the decrees of the Constitution there is no appeal; for it emanates from the highest source of power, the sovereign people. Whatever condition is assigned to any portion of the people by the Constitution must necessarily be inevitably fixed, however unjust in principle it may be, until revoked by the same sovereign power. A legislative act is the will of the Legislature, and the Constitution is their commission, and they must act within the pale of their authority." Smith Com. on the Con., 313,

To say that the people of Leon county, even in a matter of their own exclusive interest, can, by mere vote, alter and change or disregard the paramount law is to give to them a power which the people of the entire State do not possess when exercised in this form.

It was admitted in argument, and the majority of the court in their opinion do not contest the concession that the Legislature of the State cannot rightly exercise such power, cannot issue bonds for such purpose, nor impose a tax of the kind. It is said to be different with the counties and cities. If the provisions of the Constitution on the subject were referable alone to the *State*, this would of itself, in my mind, raise an insuperable objection to the exercise of the power by the counties. What! the State may not tax and yet the counties may! The State may not issue bonds, yet may impart a power she does not possess! The grand council of the whole State—entrusted with the high powers of sovereignty, of life and death—with the protection of life, liberty and property—cannot approach the citizen with a demand in the shape of a tax for such purposes, but a county commissioner may, and so may a corporation! The State cannot use her sovereign power through her sheriff and *posse comitatus*, her military with the sword and musket, to collect for such purpose—cannot punish the citizen for resisting the collection of such tax—but a county and city officer may! A whole may not do an act, but a mere fragment may! An inferior may be trusted, the superior may not! It is thus a power is given to the less which was denied to the greater, virtually making the parts superior to the whole. Extravagance, waste, oppression and corruption, perversion of the fundamental law of the principles of justice and good government may be tolerated in the one, but not in the other. Such is the very insecure and unstable

foundation upon which such propositions rest for their support.

I will not offend the memory of the departed, nor depreciate the worth of the living, by presuming that whilst the convention imposed the most rigorous constitutional restraints upon the legislative department of the government in the assumption of unlimited sovereignty, of which that body might otherwise have been the repository, that yet they reposed this high prerogative in subordinate authorities, in nearly a hundred petty sovereignties to exercise this very power in a far more exceptionable and dangerous form and thereby to involve the community in the very injurious consequences which they had so anxiously endeavored to avoid. No! having been a member of that body and a witness to the patriotism and intelligence of my contemporaries, far be it from me to say that they failed, utterly and entirely in the accomplishment of one of their chief aims—a main object and end of their exertions. Although opposed at the time to the action of the majority, I will yet do justice to their sagacity and foresight by admitting my own mistake in the correct application of the great principles they established.

The only possible ground upon which such power can be supported is, that the provisions quoted in reference to State taxation, are not principles of the constitution.— Yet how utterly baseless is such position. Why were they inserted in the constitution unless as rules of government, as guides, as the fundamental law? They are in the very terms, and in the language of provisions, designed for the protection of the liberty and property of the citizen from the earliest dawn of civil liberty. "No freeman shall be deprived of his life, liberty or property but by the law of the land," and the bill of rights of the constitution, the great Magna Charta of the State, has twenty-five of these

provisions, mostly negative and restrictive in their character, like the clauses under consideration.

It is very obvious that the Court has considered itself bound by decisions made in other States which they designate as " an imposing array, indeed, as overwhelming authority." A more careful consideration of these would, I respectfully submit, have relieved the case from this difficulty. The decisions quoted are based upon the absence of restrictions in the Constitutions of the States to impair or lessen the general grant of legislative power.

The decision in Connecticut is a sample of them all.— The Court says " we have been cited to no express constitutional provision with which the resolution under consideration is supposed to conflict, except it be article 1, section 2, of the State Constitution, the property of no person shall be taken for public use without just compensation therefor;" 15 Connecticut, 501. So in Kentucky, "it would be difficult, perhaps impossible to define the extent of the Legislative power of the State unless by saying, that so far as it is not restricted by the higher law of the State or Federal Constitution, it may do any thing which can be effected by means of a law," p. 22. Again, " we find no clause or principle in the Constitution which can be brought to bear directly in restraint of this power, (the Legislative,) but that which declares that no man's property shall be taken for public use, without his consent, unless just compensation be made, &c." Nor is this without qualification. "The limit imposed to this clause of the Constitution can only consist in the discrimination to be made on what may with reasonable plausibility be called a tax, and for which it may be assumed that the objects of taxation are regarded by the Legislature as forming a just compensation, and that which is palpably not a tax, but in the form of a tax or in some other form the taking of private property for the use

of the public or of others without just compensation. That there must be a palpable and flagrant departure from equality in the burthen as imposed upon the persons or property bound to contribute, or, it must be apparent that persons or their property are subject to a local burthen for the benefit of others, or for purposes in which they have no interest, and to which they are therefore not justly bound to contribute, and that the case must be one in which the operation of the power will be at first blush pronounced to be the taking of private property without compensation, and in which it is apparent that the burthen is imposed without any view to the interest of the individual in the object to be accomplished by it." Slack vs. Maysville R. R. Co., B. Mon. 32.

With this admission, it may be contended with great propriety that plaintiff's case is made out, as fully demonstrated in this opinion. If this is not " the case—of a local burthen for the benefit of others and for purposes in which he, the complainant has no interest"—it will be difficult to find one.

Very obviously the cases cited are applicable to constitutions having no restrictions upon legislative power. The fact is, there could not by possibility be an authority elsewhere in point to a case arising under our Constitution, as no Constitution of any other State of the Union has the same restrictions upon legislative power. Arkansas approaches nearest to it, as by a vote of two-thirds of the Legislature they may avoid the effect of the provision of our Constitution as to necessary expenses. With us the provision is absolute and unconditional, and with this difference, was borrowed from the Constitution of that State, made a few years previously. It is a remarkable fact, that after the year 1850 the Constitutions of all the new States were framed in express reference to this very subject—to pre-

vent an abuse of the taxing power. The very courts sustaining the power admit its tendency to wrongful and injurious exercise. Thus the Court of Appeals of Kentucky, in the case quoted, say " we avow, as this court has heretofore done, that we regard the power of local taxation, and especially when exercised or controlled by the local majority, as one *eminently subject to abuses involving injustice and oppression.*" 13 B. Mon., 33.

The new States, Michigan, Wisconsin, Texas, Arkansas, Iowa and California, made their constitutions, and the older States, Ohio, New York, Kentucky, Mississippi, Indiana and Illinois, amended theirs with most stringent restrictions, principally to attain this end. New York, earlier even than this, amongst others, made a provision of this kind. " The assent of two-thirds of the members elected to each branch of the Legislature shall be requisite to every bill appropriating moneys or property for local or private purposes." Great must have been the incentive, urgent and irresistible the necessity which induced this successive and almost simultaneous movement of the people in so many different States to remedy a mischief, not transient and temporary, but so fixed and deep-seated as to require so radical a change in their fundamental law. It establishes beyond a doubt the important principle that this assumption of unrestricted sovereignty in the imposition of taxes and disbursement of public money, has no foundation in American institutions, and is not fitted to American soil.

When it is admitted that these provisions of our Constitution are so important in their character, so operative as to prevent legislative action—when it is seen that they are expressly applied to the counties and cities—where can there be rational or even probable room for doubt? If the Florida Convention had no such design in the adoption of

these provisions, it is respectfully asked what was the end sought by their introduction? Have they no meaning—no purpose—no object? Is our Constitution like that of Connecticut or Kentucky, Pennsylvania or Louisiana, or Ohio, so that a decision made by their courts is an authority for us?

The words used possess a profound significance and meaning. The space they occupy is not a mere blank, nor are they to be rejected as a dead letter, ineffective and inert, having no existence—a mere sound, signifying nothing. To disregard them, I submit with deference, is to exert a power of repeal and not of construction; and this opinion of the court will inevitably effect what a respectable minority of the Convention failed, after repeated efforts, to accomplish by direct motion, to strike out these very provisions.

Great stress is laid upon a decision made in Tennessee, because the Constitution of that State is said to be like ours. Let us determine this. "The General Assembly shall have power to authorize the several counties and incorporated towns in the State to impose taxes for county and corporation purposes respectively, in such manner as shall be prescribed by law; and all property shall be taxed upon the principles established in regard to State taxation." 29 sec., 2 art., Cons. Tenn.

"All property shall be taxed according to its value. That value shall be ascertained in such manner as the Legislature shall direct, so that the same shall be equal and uniform throughout the State, and no one species of property shall be taxed higher than any other species of property of equal value." Sec. 28, same Constitution.

Now, the only resemblance here is that of equality, uniformity and according to value; and the tax of counties and cities is to be for county and corporate purposes. There

is no restriction as to necessary expenses—none as to aiding corporations. Unless, then, an adjudication upon a Constitution without restriction upon the legislative power, which, according to the doctrine of its courts, is unlimited, be applicable to a State Constitution having restrictions confining the Legislature in this very respect, then indeed, the authority is inapplicable. It is lamentable to observe the slight influence of words to abridge power or to restrain and prevent its doubtful exercise. Let there be line upon line and precept upon precept, yet some means of evasion will be devised, and this tendency prevails in direct ratio and proportion to the interests involved. Not so, however, with a grant of power, which, though ever so vague and indefinite, yet from its inherent propensity of aggrandizement, never fails to discover the most plausible and authoritative pretexts and excuses for any desired extension.

The power of the judiciary to disregard an unconstitutional law is declared in the opinion of the majority to be aggressive, as having been used for mischievous purposes. It is even characterized as a deadly weapon. The authority for so grave an assertion, so serious a charge, is not given. I am confident none exists. I am not aware that any one even in the heat of party excitement has ever before carried his views to such an extreme. What court has committed this grave offence? Certainly not the Supreme Court of this State, that has exerted this power but on one occasion, as far as I recollect. Is it the Supreme Court of the United States that has had greater occasion to bring itself within the reach of the charge than any other?

But is there the slightest pretext or color for any such notion? If the idea of aggression was ever entertained in the wildest dream of any judge, a simple survey of his position would effectually extinguish such sentiment.

A Court makes no law, controls no means, no monied resources, has no patronage, (in this state does not appoint its own clerks.) The disposition of all these is by the other departments of government. It cannot initiate action in the slightest case ; like an arbitrator it acts only as questions are brought before it, and grants or refuses only on such application. Sometimes the legislature or executive obtains its aid to enforce a law, or punish for disobedience to one.

At other times the citizen claims its interposition, insisting that legislative or Executive action is to his injury and that the supreme law of the land, the Constitution, is his shield, and constitutes a protection to him. In such case, the Court performs the simple office of deciding which is superior, and when an act of the legislature or the executive is in conflict with the Constitution, it announces the fact and gives efficacy to the supreme law. It is then perfectly clear that the action of the Court cannot be aggressive except where it fails to interpose for the protection of the citizen against an unconstitutional invasion of his rights. In such event the court makes itself an accessary by the aid rendered, and to this extent will its action be aggressive. The present case will be an apt illustration if we are right in our views as to the unconstitutionality of the law.

How this action can be justly characterized as a deadly weapon is beyond my powers of conception. If there be serious and fatal consequences attendant upon the exercise of such power by the judiciary, they will arise from the imbecility or want of independence and integrity of its members in the discharge of the important functions confided to them. They can never attach to a faithful and conscientious and independent discharge of judicial duty, for if liberty is to be crushed and freedom to find its grave, an

honest and undaunted judiciary will be found unflinch-
ingly maintaining its post in defence of the Constitution,
and perishing only amid its ruins. The deadly weapon
will then be found in the hands of its foes, and the fatal
wound inflicted by its enemies—the enemies of constitu-
tional liberty and free government.

The importance of a proper exercise and discharge of this
duty is illustrated in the impressive language of the sages
and patriots of the Revolution, the fathers of the Consti-
tution of the United States, and by eminent jurists and
statesmen.

The late Daniel Webster in a debate in the Convention
of Massachusetts, thus happily and forcibly expressed him-
self: "No conviction is deeper on my mind than that the
maintenance of the judicial power is essential and indispen-
sable to the very being of this government. The Constitu-
tion without it would be no Constitution, the Government
no Government. I am deeply sensible, too, and I think
every man must be, whose eyes have been opened to what
has passed around him for the last twenty years, that the
judicial power is the protecting power of the whole Gov-
ernment. Its position is on the outer wall."

The great Patrick Henry, than whom no one was more
jealous of power, and who opposed with all his might the
Constitution of the United States on account of the large
power grants in it, thus expressed himself in the Virginia
Convention : "The honorable gentleman did our judiciary
honor in saying they had firmness enough to counteract
the Legislature in some cases. Yes sir, our judges op-
posed the acts of the Legislature. We have this landmark
to guide us. They had the fortitude to declare that they
were the judiciary, and would oppose unconstitutional
acts. Are you sure that your federal judiciary will act
thus ? Is that judiciary so well constituted and so inde-

pendent of the other branches as our State judiciary? Where are your landmarks in this government? I will be bold enough to say that you cannot find any. I take it as the highest encomium on this country that the acts of the Legislature, if unconstitutional, are liable to be opposed by the judiciary."

Chancellor Kent says, "there can be no security for the minority in a free government, except through the judicial department. In free governments, the independence of the judiciary becomes far more important to the security of the rights of the citizens than in a monarchy, since it is the only barrier against the oppression of a dominant faction, armed for the moment with power, and abusing the influence acquired under accidental excitement to overthrow the institutions and liberties of the people." 1 Kent. Com.

Mr. Madison, justly styled the father of the Constitution of the United States, speaking as to the position of the judiciary and the necessity for strengthening it, says : "Experience in all the States had. shown a powerful tendency in the Legislature to absorb all power into its vortex. This was the real source of danger to the American Constitution, and suggested the necessity of giving every defensive authority to other departments consistent with republican principles." Debates in Convention, p. 1163.

Governeur Morris said, "he concurred in thinking the public liberty in greater danger from legislative usurpations than from any other source." P. 1165.

"As the Constitution is the supreme law of the land, in a conflict between the laws either of Congress or the States, it becomes the duty of the judiciary to follow that only which is of paramount obligation. This results from the very theory of a republican constitution of government; for otherwise the acts of the legislature and execu-

tive would in effect become supreme and uncontrolable, naturally, notwithstanding any prohibitions or limitations in the Constitution, and usurpations of the most unequivocal and dangerous character might be assumed without any remedy within the reach of the citizen. The people would thus be at the mercy of their rulers in the State and national governments, and an omnipotence would practically exist like that claimed for the British Parliament." 3 Story, 428–9.

Such are the views I have entertained on this subject, derived from these eminent sources. They have governed me to the extent of my limited capacity in their application to the present subject. The maintenance of the Constitution, of the great fundamental principles of free government is, in my view, pre-eminently superior to any mere question of expediency or regard for improvements, however important they may be to the welfare of the State. I might lament a restriction which would be detrimental to this enterprise, but for such I am not responsible; the remedy is in other hands. My duty is to declare the law as it is; and, having a clear conviction in my own mind, free from any doubt, there remains the questionable and imperious duty to announce it. I find no necessary expense of the county of Leon—no county purpose, which justifies the levy of this tax. The law is, in my opinion, therefore, dalpably unconstitutional.